Jack Shaucet and Idabelle Shaucet v. Commissioner.
Shaucet v. Commissioner
Docket No. 60089.
United States Tax Court
T.C. Memo 1957-133; 1957 Tax Ct. Memo LEXIS 116; 16 T.C.M. (CCH) 607; T.C.M. (RIA) 57133; July 26, 1957
*116 Held: On the facts, that the $16,200 paid to Idabelle Shaucet in 1952 was prepaid rent and includible in her gross income for the taxable year. R. T. Boehm, Esq., 1200 West Fifth Avenue, Columbus, Ohio, for the petitioners. David M. Robinson, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent made the following determinations with respect to the petitioners' income tax: Addition to Tax
Year
Deficiency
Sec. 294(d)
1952
$5,916.22
1953
$99.75 The adjustment for 1953 is not contested. The only issue for decision is whether $16,200 which was received by Idabelle during 1952 pursuant to a lease agreement is includible in petitioners' gross income under *117 section 22(a), Internal Revenue Code of 1939. Findings of Fact Jack and Idabelle Shaucet, petitioners herein, are husband and wife. They filed a joint income tax return for the calendar year 1952 with the director of internal revenue at Columbus, Ohio. During 1945 and 1946 Idabelle acquired title to two parcels of real estate in Columbus, Ohio. The two parcels comprised the corner location of East Town Street and South Sixth Street in Columbus. At the time the property was acquired it was used for dwelling purposes principally of the light housekeeping type. At this time the units were leased directly to individual tenants. There was a rapid turnover in tenancy and few occupied a unit longer than 90 days. After the acquisition of the two parcels by Idabelle they were managed by Jack and were treated and considered as one property. During this period the property was remodeled and converted into 39 efficiency apartments each of which was fully furnished. The value of the furniture in each apartment was approximately $700. During the course of the remodeling petitioners required the services of an attorney in connection with the eviction of a tenant whose occupancy interfered with *118 the remodeling project. The property had been damaged to some extent by this tenant. Petitioners had experienced other instances of damage to the property and furniture beyond that of ordinary wear and tear. The remodeling of one unit was delayed for approximately one year by the refusal of a tenant to move from the property and after the tenant did leave the property some malicious damage was discovered. After the remodeling was completed in 1952 Jack engaged a real estate salesman to negotiate a lease whereby one lessee would control all of the apartments. The petitioners agreed to lease the property to a Dr. Rhoades and his wife. Jack had received a very good report with respect to Dr. Rhoades' character as a lessee. However, the negotiations were delayed until petitioners secured written evidence that the rental rates had been approved by the rent control authorities. Subsequently the petitioners' attorney prepared a five-year lease between the parties which provided for a payment of an annual rental in the amount of $16,200 payable in equal monthly installments of $1,350, commencing November 1, 1952. The lease further provided that the lessees agreed to deposit with the lessor *119 the sum of $16,200 "to be held by Lessor as security for the payment of the rent and the performance and observance by the Lessees of all the covenants, agreements and conditions of this lease on the part of the Lessees to be performed and observed, until the last year of this lease from November the 1st, 1956 to November the 1st, 1957, at which time the Lessor shall apply said sum so deposited for the payment of the rent for said last year of the term thereof." Among the 21 specific covenants and terms to be performed by the lessees were the following: to timely pay the rent; to pay all utilities; to make and pay for all interior repairs; to comply with all laws, ordinances, rules, regulations, and requirements of all regularly constituted authorities; to not use or occupy the premises for any unlawful purpose; to make no change in the construction of the building or major improvements on the premises without the written consent of the lessor; to permit the lessor or her agent to enter the premises at all reasonable times to examine their condition; to pay as liquidated damages double rent for the entire time during which the lessees retain possession of the premises after the expiration *120 of the lease; to surrender the premises at the end of the lease in as good condition as at the beginning or may be put by the lessor, reasonable wear and tear excepted. The lease had the following provisions for termination: "PROVISION FOR TERMINATION: " Provided, however, that if said rent, or any part thereof, shall at any time be in arrears and unpaid, and without any demand being made therefor, or if said Lessees shall fail to keep and perform any of the covenants, agreements or conditions of this lease on the part of the Lessees to be kept and performed, or shall make an assignment for creditors, or enter into bankruptcy proceedings, either voluntary or involuntary, or if the interest of the Lessees therein shall be sold under execution or other legal process, or if said Lessees shall abandon or vacate said premises during said term, then and in any such cases, it shall be lawful for said Lessor to enter into said premises, and again have, repossess and enjoy the same, as if this Lease had not been made, and thereupon this lease, and everything herein contained on the part of said Lessor to be done and performed, shall cease, determine and be utterly void; without prejudice, *121 however, to the right of the Lessor to recover from said Lessees all rent due up to the time of such entry. The commencement of a proceeding or suit in forcible entry and detainer, or in ejectment, or otherwise, after any default by the Lessees, shall be equivalent in every respect to actual entry by the Lessor. In case of any such default and entry by said Lessor, said Lessor may relet said premises for the remainder of said term for the highest rent obtainable and may recover from said Lessees any deficiency between the amount obtained and the rent hereinbefore reserved; and Lessor may retain, apply and consider the said deposit now in his hands as liquidated damages for the violation of any of the terms of this lease on the part of the said Lessees." * * *
On November 1, 1952, the lessees paid Idabelle $16,200 under the terms of the lease agreement in addition to the rental for the first month. No interest on the $16,200 was paid by petitioners and the money was deposited in their regular bank account. There were no restrictions upon the use of the money by the petitioners and there were no provisions for its repayment. Since November 1956 the lessees have paid no monthly *122 rentals and none are expected under the lease. After leasing to the Rhoades the petitioners made no inspection of the property until the day of the hearing in this case, some four years later. At that time petitioners estimated the value of the furniture was approximately $4,000 less than at the time of the execution of the lease. The $16,200 in dispute was primarily a prepayment of rent. Opinion The only question before us is whether the $16,200 received by Idabelle on November 1, 1952 constituted security for performance of the lease or was primarily advance payment of the rent for the last year of the lease and includible in petitioners' gross income under section 22(a), Internal Revenue Code of 1939. It is settled that an amount paid to a lessor as rent in advance is taxable income in the year of its receipt. New Capital Hotel, Inc., 28 T.C. - (June 25, 1957). However, if an amount is deposited with a lessor merely as security for the performance of covenants, with no present right to claim of full ownership in the lessor, it is not treated as taxable income unless and until something happens to make the deposit or a portion of it the property of the lessor. Astor Holding Co. v. Commissioner, 135 Fed. (2d) 47. *123 Where the deposit serves as security for the lessee's performance and may also be applied as rent, it becomes necessary to determine whether the deposit was primarily a security payment or a prepayment of rent. Gilken Corporation, 10 T.C. 445, affd. 176 Fed. (2d) 141. Whether a payment falls into one category or another depends upon the facts of the particular case. We have found as an ultimate fact that the advance payment of $16,200 was primarily rent. This conclusion was reached after noting the following facts: the payment was to be applied to the last year's rent; the petitioners were not required to pay any interest on the deposit; petitioners were under no obligation to repay the deposit; the deposit was placed in the petitioners' general bank account; there were no restrictions upon petitioners' use of the deposit. These factors all indicate that the petitioners had the free and unrestricted use, enjoyment, and disposition of the advance rental payment during the taxable year in which it was received. The petitioners' position seems to be that the sole intention of the parties when the lease was executed was to provide some security for the performance *124 of the lessees' obligations under the lease. This argument is not persuasive in view of the fact that petitioners had the unrestricted use of the money and there were no provisions for its repayment under any circumstances. Cf. Hirsch Improvement Co. v. Commissioner, 143 Fed. (2d) 912, affirming a Memorandum Opinion of this Court. John Mantell, 17 T.C. 1143, and Clinton Hotel Realty Corporation v. Commissioner, 128 Fed. (2d) 968, relied upon by petitioners, are distinguishable. In the Mantell case the lease expressly provided that the deposit was not to be applied as rent, and in both the Mantell and Clinton Hotel cases there were provisions for the return of the deposit to the lessee. Decision will be entered for the respondent.